Our second case is 25-1449 Jackson v. Bush. Mr. Hawkins, whenever you're ready. Good morning, your honors, and may it please the court. Your honors, well, my name is Josh Hawkins, and I'm going to give you a little bit of background. The backdrop of this story is fairly important, so I'll just take 30 seconds to give the court the backdrop. Mr. Simmons, the decedent in this case, was housed at the South Carolina Department of Corrections from 2016 to 2020. During that time, he was repeatedly attacked, including at least four stabbings that we know of. I'm personally involved in litigation in three of those. These attorneys are involved in those three cases. During that time, it's important to remember that this is kind of particularly tragic because his co-defendant's charges related to weapons and burglary and that sort of thing were overturned, so there's a good chance that his conviction was going to be overturned, but he was in SCDC, he was repeatedly attacked. At one point, he says, do I have to die for somebody to take this seriously? So, that's all important because he had requested protective custody, and he was in F-2 unit when he was fatally stabbed. What we're going to talk about, he was in F-2 unit, which is where the people were sent who requested protective custody. So, when Bush, the primary culpable person that we're going to talk about, the guard, when he goes down to F-2 on the day of questioning, he knows subjectively that everybody in here is potentially a target. They've all been attacked. They've all been targeted. This is a vulnerable group of people. Does he know about Mr. Jackson's particular history? He does not know specifically about Mr. Jackson, but he knows that Mr. Jackson is one of the many vulnerable people that he has a duty to, and we know from Cox v. Quinn that you have a duty to protect inmates from the danger of other inmates, and we know from Farmer that when somebody's vulnerable, like all these people were, all these targeted people who had protected P.C., you have a duty to protect those people, even if you don't know the exact assailants. That's what happened for him. And so, when he goes down there this day, he knows that, one, everybody's vulnerable. Two, he's in a maximum security facility full of dangerous people, and he knows that all these people who were locked up are not supposed to get out of their cell unless there's a reason, unless there's a reason to let them out. Before you keep going, I thought there was testimony from, is it Officer Bush, that he didn't know that Simmons was being threatened? No, there's testimony in the record, Your Honor, that he didn't know specifically that Simmons was being threatened, but he knew that F-2 is where vulnerable and targeted people were housed, so he knew that everybody in there was a potential target. And so, he didn't know a thing about Simmons specifically, but he knew that if he created an unreasonable risk or if something was obvious and could easily be averted, that he took steps toward creating that risk, that it was going to be a near certainty that there was going to be a calamity and some sort of violence, because if he lets somebody out in an unauthorized way and mixes them with vulnerable people, then they're going to have, you know, people that are being targeted. So, he has that subjective knowledge. The policy that required him to check the worksheet on the lieutenant's door would have prevented this, and of course- I was looking through the record. Which policy are you referring to? I mean, I know there's testimony that, you know, he was supposed to check the record, but which policy, written policy, are you referring to? Your Honor, I can't point to the SCDC policy by policy number, but at 822 and 884 and 859 of the record, there's testimony about what he should have done. For example, Robert said that that, you know, he's given oral testimony about the policy. What he was supposed to do, if an inmate was wanting to be out for some reason, was go and check this worksheet and make sure he wasn't letting somebody out who wasn't supposed to be out. He testified that he knew that inmates lie to get out. He knew about that. He knew that they make weapons. He knew that he was supposed to, you know, he knew that everybody in there was vulnerable, like I said, and he could have gone and checked the worksheet, or he could have used the radio, or he could have asked an officer, the superior, hey, is this okay, because we know that, you know, in the Brown versus the North Carolina Department of Corrections case, if you know that a danger can easily be averted and you fail to do it, that's a fact for a jury to  This was not only easily avoidable, he had to take extra steps to make it possible. All he had to do was leave the guy where he was supposed to be, which was in his cell. Well, let me ask you about that, because I think, I don't think there's any, I don't think that there's any dispute that he did not check the record that day, but the two guys, I think Ransom and Dominic, I think Ransom was a barber, and so he, even though he didn't check it, I'm assuming if he checked the list, he was able to be let out of his cell, and I think Dominic was a, he had some job also where he was able to be out of, would that not make a difference? Well, Your Honor, it might to jurors, and McDessie versus Field tells us that jurors are the ones to make this decision. This is all circumstantial evidence for a jury to consider, because Dominic was not a barber, for sure. Yeah, I think, but he was like a ward keeper or something, and so he was able to, he was able to be released from his cell also. Yeah, and they offered, those officers offered sort of some self-serving testimony on that issue, and that's all fair game for a jury to consider, but the jury, I think, has to consider, one, it's undisputed that he, the person who did the stabbing was not a barber, and two, it doesn't matter if they were both barbers or hairstylists or whatever, you don't just let somebody out because they asked to be out. You're in a maximum security facility. You only let them out during the time there's an authorization for them to be out, and if they ask to be out, you go and you do this, any one of these grocery list of things that you can do to verify that you're not about to create an almost certainty that there's going to be violence. Mr. Hawkins, you know, those are all great jury arguments, as you say, but you don't get to a jury unless you get past the qualified immunity test, which is intended to prevent defendants from being exposed to a jury where the risk isn't subjectively and objectively identifiable, and the particular actions by the defendant that he was on those were clear violations of the Constitution. So you, I mean, the problem is here that it's not, well, maybe you can explain to me why you think otherwise, but how did Mr. Officer Bush understand that Simmons was subjected to a particular risk of death or injury by this particular inmate? Well, Your Honor, there's not evidence that he was knowledgeable about that particular assailant or that particular inmate, but Cox and Farmer and all these cases tell us that's not the test. The test is, do you know about, the test is do you know about an injury? Do you know about a person being vulnerable? And he knew that, he knew that it didn't have to be Simmons. It could have been any of these vulnerable people because he knew that they all had requested PC because they were being targeted. So in that scenario, to go and then let out somebody on a suspicious request, and by the way, he belies his subjective knowledge that what he's about to do is deliberately indifferent because he tells the guy, he says, all right, don't BS me now. Are you really supposed to be out? You're talking to an inmate who's in jail. Of course he's going to tell you what he has to say to get out. So that hesitation belies his subjective knowledge that he's about to do something that's not in bounds. And the magistrate, Judge Hodges, you know, she sort of says in the report and recommendation, well, it's negligence or gross negligence, but it doesn't rise to the level of deliberate indifference. Well, that's for a jury. Now, she's weighing . . . Well, we have this King versus Riley case that says that knowingly violating a policy doesn't, I think that's probably what she cited, is it doesn't necessarily rise to the level of deliberate indifference. And so I don't, I'd be interested to hear your response to the King. How do we get around a King versus Riley? Well, we get around that, Your Honor, with the Brooks case or with the McKinney case, the Dean versus McKinney case. Dean versus McKinney was a police chase case, so it's a Fourth Amendment context, but it still looks at the analysis of a policy. And the court, this court, said in that case that that violation of that chase policy was relevant and determined that qualified immunity did not apply because it showed that there was no exigent circumstance in that Fourth Amendment context. Now, in an Eighth Amendment context, which is where we are today, we have the, I believe it's the Brooks case, it says policy violations are highly probative or highly relevant. And we don't take the position that policy violation equals a constitutional violation, but we do take the position, Your Honor, that along with all these other factors that we're talking about, that's evidence for a jury. So, if there's a net, if there's a policy, hey, you don't let people out of their cell just because they ask. If somebody wants out, you've got to go take these other steps and make sure they have an authorization to be out. That's, that's relevant to a jury's analysis. You know, when I stand up, hopefully when we go back and I talk to a jury about this, that's one of the pieces of circumstantial evidence described in McDessie v. Fields. McDessie didn't describe policy violations, but it did talk about, you know, a side of that form where it says, deliberate indifference is something that's proven in the usual ways with circumstantial and direct evidence. And here we got a pile of it. And it might be that they win at trial. You know, they might come and they get a jury and they say, look, there's no sufficiently culpable state of mind, and they might convince a jury of that. But a jury is entitled to hear about violation of written or unwritten policy, you know, disregard for the safety of these people who had requested PC, failure to check with supervisors, failure to use the radio, and then importantly, this is highly relevant, Your Honor, and highly probative, he turns his back on the situation. He lets the guy out of this cell on a suspicious request without consulting the list, in a maximum security facility, in the unit that's full of people who protect the PC who are vulnerable. And then he doesn't do anything for at least six minutes to even monitor the situation because Ransom, or excuse me, Dominic, is walking around with an eight-inch blade in his hand on film, on camera for six minutes. And nothing happens. Nobody intervenes. Now, there's not evidence that Bush saw the video of that, but Bush certainly created the scenario, and then, you know, he basically created a Hunger Games situation. You know, good luck. He let these people out. He let them intermingle, and then he didn't pay any attention. He went back to doing, you know, whatever he was doing, training, math, I think it was. He was also the only person down there, and there's some testimony that when you're the only trained person down there, you know, other than the person he was with, there's conflicting evidence on that around 8 to 59, or I'm not sure which page of the record that's on, but there's some conflicting evidence around whether he should have let anybody out at all, much less let somebody out just because they said they wanted to be out of their cell. And so, when you look at all this stuff in the aggregate, for sure, there's a lot of evidence by which a jury could conclude that there's deliberate indifference. There's no question about the second prong of the test. I mean, he died. He was, you know, he bled to death. He's covered in blood. Youngquist comes up to the door. They drag him over there. He's incapacitated, of course, been bleeding out for the better part of an hour, and Youngquist looks, and she says, oh, I thought they were playing. Well, she didn't do anything to call help for anybody for several minutes, long enough for them to leave, and then come back, and then by her own count, that's at least two minutes, or she says that the encounter didn't last more than two minutes, but two minutes when somebody's bleeding to death, I mean, 20 seconds would have been too long to just say, oh, y'all stop playing, and a jury's entitled to hear the evidence about his appearance because he bled, so much blood came out of his body that he bled to death, so it wasn't, he didn't have a little bit of blood on his side. He was covered in blood, and he was dragged there, incapacitated by other inmates, and when the other inmates had left and come back, they said, hey, Youngquist, come on, open the door. They're pleading with her to do anything, and so we acknowledge that we, you know, I read back through the brief and in researching and preparing for this argument, we understand that the arguments as to Robertson and Parks and that, we might not get a deliberate indifference on those defendants, but as to Bush and Youngquist, we do because there's evidence of deliberate indifference from which a jury could conclude that there's liability here, and so what we ask the court to do is reverse this, send it back, and at least as to Bush and Youngquist, let us have a jury trial so that a jury can hear the evidence in this case, Your Honor. All right, thank you, Mr. Todd. Thank you. We've got some time for rebuttal. Mr. Linden. Thank you. Thank you, Your Honor. May it please the court. My name is Andrew Linden, and I represent the appellee, Gerald Bush, with me here today is David DeMasters and Russell Harder, who represent the other appellees, and I'm presenting the argument for all the appellees. In this particular case, and again, I'll start with some of the appellees other than Mr. Bush. I'm not certain that that was just a concession from appellant's counsel that they're unable to show deliberate indifference for Associate Warden Robertson and... It sounded like one. It sounded like one, and Officer Mapp and Officer Parks. I'll say this very briefly. Obviously, the allegations against the Associate Warden, Mr. Robertson, are under supervisory liability. There are three distinct elements for that. There was no evidence presented that meets any of those elements, plus it's obviously, as this court has indicated, very high burden. Ultimately, the same argument as far as Mr. Parks, Officer Parks was not even in the F-2 unit. He was out on the yard on a golf cart. He received a message over the radio from Officer Youngquist that a stabbing had taken place. He drove immediately to F-2 and assisted with getting Mr. Simmons onto that golf cart and took him directly to the medical department. Clearly, there's no evidence of deliberate indifference in the failure to provide medical care for him. Let me focus on Officer Bush and Officer Youngquist. The allegations against Officer Bush are obviously a failure to protect case. Both the magistrate judge and the district judge closely analyzed the evidence that was presented in this case and determined that there was no evidence presented to meet the second element of a deliberate indifference standard, specifically the subjective standard. And quite frankly, I know opposing counsel just told this court this morning that there's evidence that Gerald Bush was aware that F-2 housed inmates who had requested and been denied protective custody. I don't believe there's any evidence in the record to support that. In fact, Officer Bush was not typically assigned to F-2. He was typically assigned to F-3. That particular morning, Officer Youngquist was running late. Officer Bush covered the first 45 minutes or so of the day shift in F-2. He was directed to release inmates from the top tier as well as any type of working inmates. But there's no evidence that he was aware of the history of that particular unit. And certainly there's no evidence that he was aware of any history of that Mr. Simmons had either at McCormick or at previous institutions as far as other assaults. If that unit had been his regular unit, you think the claim would still fail because of the lack of evidence from your perspective of a particular threat from the inmate who eventually killed Mr. Simmons? Absolutely, Your Honor. And the main reason I'm making... I mean, your colleague on the other side says that that can't be right because by definition, all these inmates are there for a reason. They're at a heightened risk of harm. And officers should understand that and act accordingly. Well, I would disagree. There still needs to be a specific risk. As this court indicated in the case Judge Benjamin mentioned, the King versus Riley case, that simply having a general idea that there's violence in prisons, general risk of harm is not sufficient to establish a deliberate indifference. You have to have the specific risk of harm. In this particular case, there's absolutely no evidence that Officer Bush had any knowledge, number one, of Mr. Simmons, Mr. Simmons having any specific vulnerabilities, any issues between Mr. Simmons and the other two inmates, Ransom and Dominick, and that there was no evidence that would suggest that any risk of harm was even obvious. And the district court did a good job, I believe, of going through that absence of evidence. I brought up the fact that there wasn't even knowledge by Officer Bush as to the type of inmates who were in F-2 because opposing counsel indicated that there is. The only person who testified to that was the associate warden. Officer Bush did not. Wait a minute. Officer Bush disputed that, right? That he knew there were previous, not allegations, but complaints that they're in danger. That's why they were there. He disputed that, right? My recollection, he was not even asked about the, and I may be incorrect about that, but I don't recall any testimony in his deposition where he was even asked about knowledge of inmates in F-2. But he indicated that he was unfamiliar with F-2 inmates because that was not his typical unit. So he denied it then? I'm sorry, Your Honor? He denied any knowledge that these people were there because they were under threat. That's why they were there. He denied that. Well, he denied having any knowledge. He denied that he had no knowledge of their status while they were there. That's denial, isn't it? I believe that's correct, yes, Your Honor. That's disputed, isn't it? Well, I don't believe so, Your Honor. You just said that somebody else said that these people were there for that purpose and he was there. So the fact is that that was their status. He says, I didn't know. We have to accept that as that that's the case. And we don't take in Fourth Circuit qualified immunity. We don't deal with that in terms of facts or disputes. That's a big part of this thing. Because the question is now, did he know whether he had individual problems with that person? The allegation is that this area they were in, in the prison they're in, is so dangerous that people ask to be put there because they're in danger. And therefore, their theory is that it didn't matter which person might hurt you, all of those people because we're under threats. And that's why they were there. And therefore, you just let somebody out. And matter of fact, he should have known the danger because he said, well, are you sure? Don't be BSing me now. Are you sure? You really? So in his head, so he knew that there was danger and said you wouldn't ask questions like that. And then without checking the door, he lets those two people out and they brutally murder this man in a matter of not seconds, but a few minutes, right? And then he left the area. Matter of fact, he let them out and he left the area, right? He was called to another area. Is that right? When Officer Youngquist reported to F-2, he went to a different unit. Yeah. So he had let this potential danger situation and he left. So you're saying that's not a disputed fact? In other words, people don't have to confess like, okay, as long as I don't confess that I know that's not a disputed fact. What it is, it's the series of circumstantial evidence and other evidence that says, yes, you did know. And that's what a disputed fact becomes from, right? Well, yeah, I disagree. And just to clarify. What do you disagree with? This was not a protective custody unit, Your Honor. These inmates had not been granted... I know it. They were there because they hadn't been. They were in sort of, well, we can't put you in PC formal, but this is an area where you sort of, we give you a heightened scrutiny, if you will, here. And then there's general population. So you're right. They weren't PC, but they were in that heightened area for a reason. And the evidence is, circumstantially, and others, that he should have known that and just let them out. And he, in the record, he admits that he had some questions about it because he said, yeah, as I just said, well, wait a minute, I'm not even sure. He's taking their word for it. Is that guy's a barber? As a matter of fact, he asked other people, isn't he? Is he a barber? Yeah, he's a barber. Let him out. Isn't that right, counsel? Am I right about that? Didn't he say he's, somebody said, yeah, he's a barber, let him out. Somebody else, another inmate said, yeah, he's a barber, let him out. Is that right? Well, but as Justice Benjamin indicated. I want you to get the, for the record, this appellate record here. Isn't that right? That's what he did. He asked, somebody said, verified, yeah, he's a barber, and he let him out. Yes, he determined that, from what he was told, that they were barbers. He was told that by an inmate, right? That's correct. Now, but ultimately, Mr. Ransom, I mean, inmate Ransom was a barber, and inmate Dominic was also entitled to be released because he was a ward keeper. He had a job as well. And the testimony, I mean, it was, the record shows, has the face sheets for both of those inmates, which reflect those jobs. So, ultimately, the district court took judicial notice of that information. It's undisputed. The plaintiff hasn't disputed that Ransom was a barber or that Dominic was an assistant ward keeper. So, they were entitled to be out that morning. The district court took judicial notice of that? They took judicial notice of the face sheets that were, and they're in the record, in the joint appendix. The face sheets show a listing of the different jobs that these particular inmates held. Do the face sheets say what day they were out for those jobs, what day they were to be released? The face sheets show what day they were supposed to be out. The face sheet shows when they held those positions at McCormick Correctional Institution. When they held the position. That's right. But does it show when they were allowed to be out of their cell? Well, they were allowed. Counsel, can you just ask the answer? Yeah, I understand. Does it show, it's a document that the court took judicial notice of, does it say what date they were supposed to be out? You're telling me it shows that they are barbers or they have a job. Does it show when they were supposed to be out? The face sheet doesn't include that information. It doesn't, I know. What difference does that make if you have a job and you're not supposed to be out at the time that you were let out? So I don't think judicial notice does anything to that. Well, there's no dispute that individuals who held jobs were allowed to be out of their cells that morning. That has not been disputed by the appellate. And so ultimately, the fact that those two inmates, Ransom and Dominic, both held jobs, they were entitled to be released from their cell. Regardless of whether Officer Bush should have checked some list or not. Now just tell me, who testified to that? Who testified to that? They were entitled to be out at any time. Both Officer Bush as well as, I believe, the Associate Warden testified as well. But ultimately, that was the purpose of what Officer Bush was directed to do that morning while he was waiting for Youngquist to get to work, was to release the top tier and release all inmates who were workers. And that would include Ransom and Dominic. Mr. Lindeman. Yes. On several of the inmates testified or gave statements that said that they heard fighting for about 40 minutes. Would Bush and Matt have had access to video monitors at that time? I do not believe so. I don't know that it's in the record whether there were video monitors actually in the unit itself. Of course, at that point in time, Youngquist had arrived and Officer Bush had left to go to his assignment at F4. But ultimately, the video evidence does not show, and in fact, there is no evidence as the district court found, that either Matt or Bush, number one, were aware that Dominic had a weapon or observed Dominic with a weapon. So ultimately, that was an additional factor that the district court used in its analysis of whether or not there was deliberate indifference. Let me talk about Officer Youngquist. Officer Youngquist, as I indicated, was assigned to the F2 unit that morning. She was running late, so at the point that she was in the sally port, had gotten the keys and other equipment from Officer Bush, she was in the process of entering the unit when inmates brought to the sally port door. Mr. Simmons, she didn't immediately perceive exactly what was going on, but within, the testimony was two minutes, she understood what was going on and immediately allowed them into the sally port, summoned medical assistance, summoned Officer Parks, who, as I indicated earlier, was on a golf cart, came to the F2 unit, got Mr. Simmons onto that golf cart, and got him immediately to the medical department. For a failure to provide medical care case, this is a case where they're alleging delay in providing medical care. There's no merit to that. Obviously, the delay in this case would be a matter of minutes. Her testimony was two minutes. There's no evidence in the record to dispute that representation. More importantly, there's no evidence of any substantial harm that was caused to Mr. Simmons from the fact that there was a minute or two delay in getting him out of the unit onto the golf cart and taking him to the medical department. There's no expert testimony. There's no medical evidence to suggest that there was any harm. So, this is not a case where the appellant is challenging the quality or the scope of the medical care. It's purely a delay case. And as this Court's case law, including the Webb case, indicates, you've got to show substantial harm that resulted. I mean, even if two minutes would be considered an unconstitutional delay, I would submit to the Court that it doesn't rise to that level. But bottom line is, there's no evidence of any substantial harm. As far as Officer Youngquist as well, I would point out that the district judge found that the objections with respect to the allegations against Officer Youngquist were not specific. Ultimately, she determined that they were general objections to which she then applied the clear error of law standard, found that there was no clear error of law, and obviously then adopted the recommendation from the magistrate judge. The appellant has not challenged on appeal the determination by the district judge that the objections were general and not specific, sufficiently specific as far as Officer Youngquist. So that's an additional reason I would submit to the Court that the summary judgment for Officer Youngquist should be affirmed. Mr. Hawkins began his argument with a quote from Mr. Simmons along the lines, and I'm paraphrasing, what is it going to take for someone to be concerned about what's happening to me? And we're hearing this case in isolation. There was a related case that we continued involving another lawsuit filed by the estate of inmate Simmons relating to an assault. Somebody apparently threw him over a flight of stairs. He also had been assaulted allegedly in some other institutions. And I say all of that just to, because I'm concerned about this sort of looking at these cases in isolation. There seems to have been some kind of institutional default or neglect here to not recognize that this was somebody who was in grave danger. And it may be that Officer Bush might not have known about the particular danger, but why isn't, why wasn't the institution on notice of what was happening here with respect to Simmons? Well, I think the main point to respond to that is what you just indicated, Judge Diaz, is that there's no evidence that Officer Bush had any knowledge as to any prior issues. Well, that may be, but Simmons is dead and it appears to be an institutional failure. Well, and, and ultimately there's state court litigation that's pending to address those particular issues. I mean, obviously here we're dealing with specific officers, what they knew, what, you know, and whether or not they were specifically deliberate and different, not whether unnamed parties or the Department of Corrections as a whole was somehow negligent or failed to properly protect Mr. Simmons. The issue is these specific five officers and really two as far as the failure to protect claims, and that's Officer Bush and Officer Mapp. And, and the evidence simply as the district court found does not support a finding of deliberate indifference as to those particular officers. Again, I can't speak to the institution or the department as a whole, and they're obviously not a defendant in this case, and there is other litigation that's obviously pending as Yonah has indicated. And, and, and those were a state court claims, not federal Eighth Amendment claims. Um, I see my, my time is almost up. I would . . . Well, it is up. Oh, it is up. I'm, okay, I'm in, in reverse here. I apologize. Do you have any questions, additional questions? Thank you. We would ask that the court, uh, affirm the district court's grant of qualified immunity and, uh, and, uh, ruling on the Eighth Amendment claims. Thank you. Uh, Your Honors, I, I want to sort of lead off so I don't lose track of it. There are some questions asked about whether or not these individuals, these assailants should have been out, and my colleague indicates that it's undisputed that they were allowed to be out. I don't know what that is in the record that it's undisputed they were allowed to be out. In fact, if I could point Your Honor's, uh, attention to Joint Appendix at 684, Young was testified that Bush should not have let any inmates out during the time that he was the only certified officer in the unit. She says, quote, you're really not supposed to let anybody out when you're in a dorm by yourself, and by yourself, Matt was with him, but he, she was being trained. She was not a certified officer. And so, and, and we can look at Joint Appendix at 161, again, back at 684, there's a factual dispute on that. There's a factual dispute on that, and I'll also speak before I go to a couple other points in rebuttal because Your Honor asked, um, a question about the institutional failing and the backdrop. The first statting in this case, well, it was the second, but the first one we filed suit over was so bad, the facts of that case were so bad that we got offensive summary judgment as plaintiffs, and they filed interlocutory appeal because we basically had a damages trial because there was so much overwhelming evidence, which to get summary judgment in South Carolina, it has to be a mountain. And we had so much overwhelming evidence, there was not even a fact question about their gross negligence. There's a fact question here in this case about deliberate indifference, but SCDC is a wreck. Every case we have, we find multiple policy violations. This case is no different. This person, Bush, I don't think took his job, uh, seriously. You know, he goes into a unit and, and just to march through the fact questions, he, I mean, the evidence in the record is that if, if the assistant warden knew that this is where everybody went and had protected P.C., a jury's entitled to draw the inference. I mean, that has to be drawn in our favor. Jury's entitled to draw the inference, well, of course you knew about it, Bush. That's, it was, I mean, if your boss knows about it, surely you know that this unit they sent you to on this has the people who have protected P.C. And to go to somebody's, you're the only certified officer in there, you go to somebody's cell and they say, you know, it's cool, let me out, I'm a barber, or somebody else asked you to let them out and you just go and do it, and then you turn your back, you don't go check to make sure they should be let out, and then you turn your back on them and walk around with an eight-inch blade. I mean, Cox versus Quinn and, you know, the, big seminal case, the former tells us you can draw deliberate indifference from the very fact that a risk is obvious. We don't need, you know, the Fowler case tells us this, you don't need something on, directly on all fours when it's this obvious. The Bryce versus Virginia Beach Correctional Center case tells us that you can't just say, I didn't know about the risk no matter how obvious it is, and I can't imagine a situation that would make it more obvious to any officer. And the question is, to a reasonable officer, would he have known that this would, you know, be an unreasonable act? I can't imagine a situation where that would be more clear. But is it, is it accurate that Ms. Lindeman said that this was not Officer Bush's normal duty assignment? He was covering for somebody else. Right. So, what's the direct evidence that he actually knew the circumstances of the inmates who were other than the fact that it existed, that that could be true for anybody? Well, Your Honor, I think the fact that he works at that facility and his boss says this is the practice at this facility, this is where we send everybody who asks to be in protected custody. And by the way, aside from the fact that his boss was aware of that and the jury could draw that inference, his vulnerable nature was clear because he was covered in scars from the other attacks. You know, they threw scalding hot water on him at one point, this guy. They attacked him continually. That's why he asked for PC. That's why the other people were asking for PC. They were in that unit. And so, if Bush's, if the Assistant Warden, if Bush's boss knows about this, this is the practice, this is the, whether it's written or unwritten policy of this facility, that this is where we put vulnerable people. I mean, if you weigh all the inferences and facts in our favor, then Bush knew that. Bush knew that. He goes down there, he knows everybody's vulnerable and the first person who asked him to be let out when he shouldn't be letting anybody out because he's the only certified officer there, he knows about that policy for all the units and he just lets them out. You can't, again, the last point I'll make because my time's up is the Brown case. If something can be easily avoided and you don't take steps to avoid it, that is something for a jury to consider and all he had to do was leave the guy locked up. All he had to do was call and verify. He could have done any number of five or six things and avoided this danger, but he was deliberately indifferent to this protected class of people and as a result, Mr. Simmons is dead. That's our, that's our argument, Your Honor. Thank you, Mr. Hawkins. I want to thank both counsel for their excellent arguments. This morning, we'll come down and greet you and adjourn for the day. This honorable court stays adjourned until this afternoon. God save the United States.
judges: Albert Diaz, Roger L. Gregory, DeAndrea Gist Benjamin